[Cite as *In re O.G.*, 2024-Ohio-1884.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE O.G. | : | |
| | : | No. 113444 |
| A Minor Child | : | |
| | : | |
| [Appeal by Mother, C.G.] | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 16, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22900337

---

#### *Appearances:*

Wegman Hessler Valore and Michael J. Gordillo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary J. LaFleur, Assistant Prosecuting Attorney, *for appellee*.

LISA B. FORBES, P.J.:

{¶ 1} C.G. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her child, O.G., to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). Mother argues that the court's decision is not supported by the weight of the evidence in the record.

After reviewing the facts of the case and pertinent law, we affirm the juvenile court's judgment.

## I.    Procedural History

{¶ 2}    On January 12, 2022, CCDCFS filed a complaint alleging that O.G., who was born in November 2021, was dependent and seeking temporary custody of the child.  The complaint alleges the following particulars:

> 1.    O.G. was born with multiple heart defects and has undergone two surgeries since her birth * * *.  At this time, she requires complex post-discharge medical care.
>
> 2.    [Mother's] developmental delays currently prevent her from being able to care for O.G. and her complex medical needs.  [Mother] has an appointed guardian through the Cuyahoga County Board for Developmental Delays (CCBDD).  She also resides in housing provided through CCBDD and receives assistance daily from caretakers in her home.
>
> 3.    [Mother] has ongoing mental health needs that she is not adequately addressing at this time.
>
> * * *

{¶ 3}    Also on January 12, 2022, the court held a hearing and committed O.G. to the temporary custody of CCDCFS.  On May 25, 2022, the court held another hearing, at which Mother stipulated to the allegations of the complaint.  As a result, the court adjudicated O.G. dependent.  In January 2023, the court granted an extension of temporary custody.  On June 1, 2023, CCDCFS filed a motion to modify temporary custody to permanent custody.  The court held a hearing on CCDCFS's motion to modify temporary custody to permanent custody on November 7, 2023. On November 8, 2023, the court issued a journal entry granting CCDCFS's motion,

committing O.G. to the permanent custody of CCDCFS, and terminating Mother's parental rights.

{¶ 4} It is from this order that Mother appeals, raising one assignment of error for our review.

> I. The trial court's finding that permanent custody to CCDCFS was in the child's best interest was against the manifest weight of the evidence.

## II. Hearing Testimony

{¶ 5} The following testimony and evidence was presented at the November 7, 2023 hearing on CCDCFS's motion for permanent custody.

### A. Caprisha Sinkfield

{¶ 6} Caprisha Sinkfield testified that she is an extended services worker at CCDCFS. She was assigned to Mother's case in July 2023, and she had access to the case file to review "activity logs" from before her involvement. Sinkfield testified that there were concurrent permanency plans for O.G., namely reunification with Mother or permanent custody to CCDCFS. Sinkfield further testified that O.G. remained in the hospital from birth until CCDCFS filed the complaint in the case at hand.

{¶ 7} Asked to highlight Mother's participation with CCDCFS services in this case, Sinkfield answered, "It was very minimal. I believe from the activity logs the time of September [Mother] was in jail, so the beginning of [the previous service worker] being assigned to the case there wasn't much contact with [Mother]. When contact was established, visitation established at Murtis Taylor where that was

occurring weekly. Mother missed a lot of visits." Visitation was scheduled for "once weekly, two hours" at a time. According to Sinkfield, Mother indicated that the missed visits were "due to a transportation issue and she did not know how to ride the bus, and also indicated that she often sleeped [sic] in."

{¶ 8} In reading from the case-file notes, Sinkfield testified that Mother "did have to be prompted to complete tasks, so that included changing [O.G.'s] diaper" at the visits. "There were also concerns with mom saying that she changed her diaper, but she didn't, so when the caregiver would pick her up, she would be soiled. There was also an instance where mom hit the child because the child flipped the food." Sinkfield testified that she "believed" O.G. "was around 1 when it happened." Sinkfield further testified that in January 2023, Murtis Taylor cancelled the visits "due to the inconsistency with mom showing up and the numerous times she was late."

{¶ 9} Sinkfield testified that "mental health, parenting and anger management" were included on Mother's initial case plan. According to Sinkfield, "[m]ental health was added to the case plan due to mom's history with her struggling with mental health and inconsistently being involved with service providers." In September 2022, CCDCFS referred Mother to Signature Health to "assist[] with her counseling and med[ication] management, psychiatric services." Sinkfield testified that Mother never engaged with Signature Health.

{¶ 10} Sinkfield testified that parenting services were part of Mother's case plan "due to concerns with [O.G.] being in the hospital and mom's ability to follow-

up [sic] with the medical care." CCDCFS referred Mother to Beech Brook for parenting services, and Mother completed this service in December 2022. Sinkfield testified that CCDCFS looked to Mother's "interactions during visitation, how mom is responding to the child. We look for what is learned in parenting [services], so what she can show that she's learned from the parenting classes." According to Sinkfield, parenting remained "an open concern," despite Mother completing the parenting classes, because of the inconsistency "with mom coming to visits, we weren't able to really monitor how that was going." Sinkfield further testified that Mother would have "outbursts would be probably the best way to say it" during visits with O.G.

**{¶ 11}** Anger-management services were part of Mother's case plan "due to mom's behavior during visits." CCDCFS referred Mother to Beach Brook for anger-management classes. Asked if Mother completed these services, Sinkfield answered, "To my knowledge, no."

**{¶ 12}** Sinkfield testified that all communication between Mother and CCDCFS stopped from January to mid-March 2023. Mother's visits with O.G. also stopped during this period. According to Sinkfield, Mother was homeless during this time after being "evicted from her former housing due to threatening other residents." Murtis Taylor assisted Mother with housing, and CCDCFS determined that Mother's homelessness was "resolved" in April 2023. Sinkfield also stated that Mother had a "caregiver [who] was making sure that the rent was paid monthly."

{¶ 13} When CCDCFS reconnected with Mother in April 2023, Mother indicated that she was not engaging in her case plan services at the time and she had not been taking her medication since December 2022. At some point, Mother was engaging with an organization called Transcend regarding anger management, but Sinkfield did not know the details because it was not a CCDCFS referral. Mother was fired from her job "due to a fight so she was not able to provide basic needs * * *." According to Sinkfield, Mother receives "SSI income."

{¶ 14} Sinkfield testified that "[s]ubstance abuse concerns were added to the case plan due to the previous worker observing mother to be smoking marijuana in public." Sinkfield spoke to Mother about her substance-abuse concerns in August 2023. "Mother indicated that she was smoking marijuana and stated that it was due to dealing with the stress of the case that she had been smoking." Sinkfield further testified that Mother was referred for an alcohol and drug assessment, as well as once-monthly drug screens. According to Sinkfield, CCDCFS had not received any completed drug screens from Mother. Sinkfield also testified that, to her knowledge, Mother did not complete the alcohol and drug assessment, and CCDCFS had no "sobriety date" from Mother.

{¶ 15} Sinkfield testified that from April through July 2023, Mother "started to engage with Transcend and I believe reengaged with the [CCBDD]".

{¶ 16} CCDCFS introduced into evidence Mother's records from Signature Health dating back to 2014. A document dated November 16, 2020, which was prior to O.G.'s birth and CCDCFS involvement, established that Mother was diagnosed

with schizoaffective disorder, mild intellectual disabilities, and "[o]ther psychosocial and environmental problems."

{¶ 17} In August 2023, Mother indicated to Sinkfield that Signature Health prescribed Mother mental-health medications, but Mother had not yet picked them up. According to Sinkfield, "[t]here was never any follow-up if she was able to obtain those." Sinkfield testified that a similar scenario occurred in October 2023. On October 16, 2023, Mother went to MetroHealth for mental health "medication management." Mother was prescribed medication that same day, but as of October 25, 2023, Mother had not picked up the medication. A worker from Transcend took Mother to pick up the medication on October 25, 2023. On October 30, 2023, Mother sent Sinkfield a picture of the medication bottle.

{¶ 18} Sinkfield testified that Mother had reengaged in parenting services with Transcend and Transcend "indicated that mom was actively participating in parenting classes." According to Sinkfield, Mother's Transcend case worker "was doing one-on-one sessions with mom for parenting just due to her noticing that in a group setting she wasn't engaging and her comprehension wasn't well." As of the hearing, CCDCFS did not have a certificate showing that Mother completed the parenting classes.

{¶ 19} Mother also started engaging in anger-management services with Transcend in October 2023. Sinkfield testified that anger management remained open on Mother's case plan, because these services had not been completed. Sinkfield further testified that parenting remained open on Mother's case plan as

well. Mother's housing was "verified," and Mother started a job at a clothing store in August 2023. However, Sinkfield testified that Mother "has indicted that she is no longer working," and Sinkfield had not "gotten a verifiable reason as to why." Mother's aunt "make[s] sure that [Mother's] rent is paid and she assists her, she takes her shopping every month." Sinkfield testified that "[a]fter budgeting or going over [Mother's] budget, she doesn't have much left after paying rent and with her not having a job it's a concern that she can't provide basic needs." For example, Mother receives "about 900" dollars monthly in Social Security benefits, and Mother's rent is $750 per month.

{¶ 20} Sinkfield testified that currently, Mother's visits with O.G. are bi-weekly, and they are supervised by Sinkfield. Mother has not missed any visits since Sinkfield was assigned to this case in July 2023. The visits take place at a library, and someone from the CCBDD also attends "to help assist mom with visitation." Asked if there have been any "issues or concerns" during the visits, Sinkfield testified as follows: "One concern was at a visit on the 29th of August of 2023 mother appeared to be very irritable and agitated. The child was crying throughout the visit. Mother made comments that she's doing it on purpose and mother walked out of the visit early." According to Sinkfield, O.G. was one year old at the time.

{¶ 21} Sinkfield testified that the "interaction is fine between mom and child," and issues concerning Mother "not really changing her diaper" do not exist anymore.

{¶ 22} O.G. is currently placed with Mother's cousin, who has a foster care license. Sinkfield referred to this as a "kinship placement." O.G. has been in this placement since her release from the hospital after she was born. According to Sinkfield, O.G. has her own bedroom, the home is appropriate and has "proper baby-proofing," and the caregiver is able to meet O.G.'s basic needs. Furthermore, the caregiver and O.G.'s interactions are "positive," and O.G. "is very attached to the caregiver." Sinkfield additionally testified that the caregiver is aware of and has been meeting O.G.'s medical needs.

{¶ 23} On cross-examination, Sinkfield testified that three case plans were filed in this case. In the first case plan, which was filed with the court on March 23, 2022, the issues relating to Mother were listed as "an extensive history of mental health concerns" and whether "she was able to properly care for [O.G.] due to * * * [O.G.'s] heart defect." This case plan also stated that the CCDCFS "[w]orker would like to see [Mother] complete a parenting class to assist [her] with learning new skills to care for a newborn in a safe way."

{¶ 24} In the second case plan, which was filed with the court on April 18, 2023, anger management and housing were added for Mother. According to Sinkfield's testimony, "parenting education" was removed for Mother "due to successful completion of that service."[1] The third case plan was filed with the court

---

[1] Our review of the second and third case plans shows that under the first concern regarding Mother, which is listed as "intense mental as well as behavioral health concerns," it still states that the CCDCFS "[w]orker would like to see [Mother] complete a parenting class to assist [her] with learning new skills to care for a newborn in a safe way."

on May 31, 2023, and it states that Mother "has worked some case plan services and exercises visits sometimes * * *." Mother's objectives in this case plan, according to Sinkfield, "were engage with the [CCBDD], anger management, housing, and * * * mental health."

{¶ 25} Sinkfield also testified on cross-examination that anger management was discussed at Mother's semiannual review on December 22, 2022. Mother's attorney asked Sinkfield to "explain the delay in that not being added to a case plan until April 18, 2023." Sinkfield could not explain the delay and agreed that "a four-month delay in adding a service to the case plan would cause a delay in a parent's ability to engage in that service."

{¶ 26} Sinkfield testified that Mother completed a mental-health assessment at Signature Health. Mother's recommended services were "[c]ounseling and psychiatric services." According to Sinkfield, "sometime in May or June" 2023, Mother reengaged mental-health services at Transcend, and then she reengaged again in August 2023. Sinkfield testified that, at the time of the hearing, Transcend was providing "counseling sessions as well as parenting and anger management" services to Mother. Additionally, "through Transcend she's been referred out to MetroHealth for psychiatric services."

{¶ 27} Sinkfield testified that Mother "maintains safe and stable housing," and there is "enough space" for O.G. in the home. Sinkfield also testified that O.G.'s medical condition has improved during the pendency of this case. Sinkfield's testimony on cross-examination continued.

Q: Since the child's medical condition and needs have stabilized, mother has resolved the concerns that originally led to the removal of the child, correct?

A: I would say no.

Q: And why is that?

A: Because there is still a parenting aspect, so there are still concerns with parenting.

{¶ 28} Sinkfield testified that anger management was added to this case plan in April 2023, and CCDCFS moved for permanent custody of O.G. on June 1, 2023. Sinkfield agreed that 34 days was not "enough time for a person with developmental disabilities to successfully complete an anger management class." Sinkfield also agreed that CCDCFS "filed for permanent custody prior to affording [Mother] an appropriate opportunity to complete that case plan service * * *."

{¶ 29} Sinkfield agreed that "the current placement caregiver is willing to continue a relationship between mother and the child * * *." Sinkfield further testified that the "caregiver has her reservations, but she does intend to continue some communication with mom. She doesn't want it to be consistent."

{¶ 30} Sinkfield testified that when she was assigned to this case in July 2023, Mother had completed her case plan service for parenting, "but that was a concern again, so it was reestablished." Furthermore, Mother "had established housing, but she needed to maintain the housing so it was still a concern." Additionally, there "was the concern for anger management and [Mother's] mental health." Asked if Mother "has been medication compliant during the pendency of this case," Sinkfield answered, "No."

**{¶ 31}** On redirect examination, Sinkfield explained that since she has been involved in this case, she has reiterated to Mother the case-plan objectives. Additionally, Sinkfield's review of the "activity logs" indicated that the previous case worker communicated to Mother the need to complete the services and objectives in her case plan. Sinkfield further explained that O.G.'s medical needs were no longer "a concern that influences" CCDCFS's motion for permanent custody.

### B. Michelle White

**{¶ 32}** Michelle White ("White") testified that she is the owner of Transcend Mental Behavior Group. White is also a social worker assistant and a chemical-dependency counselor, both of which "require licensure." White testified that Transcend offers "intensive outpatient" services for mental health, chemical dependency, parenting, domestic violence, and anger management. White began working with Mother in April or May of 2023.

**{¶ 33}** CCDCFS introduced into evidence Mother's records from Transcend. White testified that she did Mother's intake assessment at Transcend on May 19, 2023, and diagnosed Mother with intermittent explosive disorder, bipolar 1 disorder, caffeine intoxication, and nicotine-use disorder. White testified that from May to July of 2023, Mother's contact with Transcend was not "constant [and] consistent." However, from August 2023 to the present, Mother has "been very engaged. * * * I have seen a complete turnaround from her from the beginning up to now."

{¶ 34} White's understanding of the services Mother was seeking with Transcend were as follows: "her anger management and to try to get her baby back and to help her with coping skills, but also I know that she had some learning delayment [sic], so she didn't understand a lot of things that was going on as well too." According to White, Mother engaged in and completed parenting services, and "[e]ven though she has graduated from [anger management] services, she's still seeking services."

{¶ 35} On cross-examination, White testified that Transcend has had no contact with CCDCFS regarding Mother's case. "I didn't even know who the worker was at [CCDCFS] because they never reached out." White explained that Mother signed "authorization to release consent forms" but Transcend has not done anything with these documents, because "we don't know who to send it to."

{¶ 36} Asked if Mother was "presently a threat to" O.G., White answered, "No." White's testimony continued:

Q: What is your opinion of [Mother's] ability to parent in terms of her anger management?

A: I think she will be a good parent.

Q: And overall has [Mother] benefitted from her engagement in anger management services through your agency?

A: I'm gonna say yes.

Q: What have you worked on with [Mother] in terms of parenting education?

A: The different types of parenting style, how to actually know how to say no, how to react when a toddler is falling out, how to use time out,

how to use gentle words so that the child can understand what you're trying to get across instead of getting angry and yelling.

\* \* \*

Q: Okay. Describe [Mother's] progress with that service.

A: She's doing very well. She has not missed a day.

{¶ 37} White testified that Transcend "has been going to all of [Mother's] doctor's appointments with her," and to White's knowledge, Mother is compliant with her medication. White further testified that Transcend attends Mother's medical appointments in part to assist Mother with understanding the "medical terminology."

{¶ 38} On cross-examination, White was asked if she ever observed Mother "utilize what she has learned from the anger management when engaging with her child." White answered, "I have not been to a visit."

### C. Evelyn Bailey

{¶ 39} Evelyn Bailey ("Bailey"), who testified on behalf of Mother, stated that she is employed at Transcend Mental Behavior Group as a One Task Clinical Director. Bailey was assigned to Mother's case in August 2023. Bailey testified that Mother engages in services "[v]irtually as well as in person." According to Bailey, Mother "has a high level of engagement." Bailey meets with Mother two times per week. The Tuesday before the hearing, Mother completed her parenting-education classes. Mother is also engaged in anger-management classes and is "progressing very well." Bailey testified that Mother "was first engaged in group settings, but after monitoring her and further evaluation I felt that it was best to do it individualized

so that she can grasp everything and comprehend everything that was occurring in the group sessions."

{¶ 40} Bailey testified that, prior to her involvement in Mother's case, Mother would have "outbursts." Bailey testified as follows about what she "witnessed" concerning Mother's behavior: "What I witnessed was frustration maybe of not understanding, not feeling heard, really identifying there were some things that were going on between [Mother and] her aunt, the foster mom, so these things frustrated her and I don't think at the time she had the necessary tools to sub-de-escalate herself." Bailey testified that Mother has learned "how to pause" and "how to debrief," so that she can express herself in a "respectful and not violent" way. According to Bailey, Mother is not a threat to herself, other people, or O.G.

{¶ 41} Bailey observed one visit between Mother and O.G. Bailey testified that it "was a very nice visit." Bailey saw Mother interacting with O.G., eating with O.G., reading O.G. a book, and changing O.G.'s diaper. At the end of the visit, when the foster mom came to pick up O.G., Mother "handled herself very well. She did not get emotional. She kept telling [O.G.], okay, it's almost time for mommy to leave. She helped her put her coat on."

{¶ 42} Asked her opinion on Mother's "ability to parent her child," Bailey testified as follows:

> Well, I've only been working with [Mother] for a short amount of time, but what I can say is that she is proactive and engaged.
>
> She wants to know the development of her child. She asks a lot of questions if there's something that she doesn't understand.

I think that she would do well with the proper support, and so that means outside wrap-around services.

{¶ 43} Asked to explain "wrap-around services," Bailey testified as follows:

So I think that she should still engage in therapy if she does have the opportunity to have [O.G.] back, as well as she's going to be having a new baby.

We've also been working on time management, so if there is someone to assist her in those areas of how to navigate appointments because there are certain things that she does need help with understanding.

It's not that she can't comprehend. It's that certain things can be very difficult for her to understand if you're using big, grand words or things like that.

So speaking to her in a sense to where she can understand, and also having the positive supports around her, whether that's family, whether that's friends, she really needs that at this time.

{¶ 44} Bailey also testified that Mother is receiving individual counseling for "grief and trauma" regarding family members who were murdered. According to Bailey, these counseling sessions are "ongoing." Bailey testified that reassessments occur periodically to "judge someone's benefit from a service * * *." Specifically, Bailiey testified as follows:

With mental health it is evaluated once a year, but because she has had so many different changes in her life and different obstacles, I would say after evaluating and the completion of anger management, that is when I would conduct an updated assessment to see if those mental health diagnoses are still there or have they been sustained.

* * *

So I think now her mental health is stable. I will say that.

{¶ 45} On cross-examination, Bailey testified that the course goals of Mother's anger-management services "can't all be achieved" in the four sessions that

are remaining. Bailey "encourage[d] still having the individual[]" engage in ongoing counseling sessions. Bailey testified that "if [Mother] wanted to engage or if she could still engage with Transcend, she would still have [the] wrap-around services" mentioned earlier. Furthermore, Bailey testified that she was unaware of any substance-abuse issues associated with Mother.

## III. Law and Analysis

### A. Standard of Review — Permanent Custody

{¶ 46} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.*, 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 16. "To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. Second, courts must determine that terminating parental rights and granting permanent custody to CCDCFS is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

{¶ 47} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24. The Ohio Supreme Court recently clarified this standard in *In re Z.C.,* 173 Ohio St.3d 359, 2023-Ohio-4703, 230 N.E.3d 1123, holding that when reviewing a juvenile court's award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply * * * are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence

standards, as appropriate depending on the nature of the arguments that are presented by the parties" rather than an abuse-of-discretion standard. *Id*. at ¶ 18.

### B. R.C. 2151.414(B)(1) Factors

{¶ 48} Pursuant to R.C. 2151.414(B)(1):

[T]he court may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to [CCDCFS] and that any of the following [(a) through (e) factors] apply:

* * *

(d) The child has been in the temporary custody of [CCDCFS] for twelve or more months of a consecutive twenty-two month period * * *.

{¶ 49} In its November 8, 2023 journal entry granting permanent custody of O.G. to CCDCFS, the court found that, pursuant to R.C. 2151.414(B)(1)(d), O.G. "has been in the temporary custody of [CCDCFS] for twelve or more months of a consecutive twenty-two month period." The court also found that O.G.'s "return to the home of Mother would be contrary to the child's best interest." The court further found that "reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan * * *."

{¶ 50} Our review of the record shows that O.G. has been in the custody of CCDCFS since January 12, 2022, when the complaint was filed. The hearing on CCDCFS's motion for permanent custody was held in November 2023. Therefore, there is clear and convincing evidence in the record that O.G. had been in CCDCFS's custody for more than 12 months of a consecutive 22-month period.

## C. R.C. 2151.414(D)(1) Best-Interest Factors

{¶ 51} Also in the November 8, 2023 journal entry, the court considered several factors used in determining the best interests of the child under R.C. 2151.414(D)(1) as follows:

{¶ 52} Under subsection (a), which concerns the relationship of the children with their family and foster caregivers, the court found: "The child has a bond with mother and has a significant bond with the current caregiver/caregiver's family."

{¶ 53} Under subsection (b), which concerns the wishes of the child, as expressed in the instant case through the child's GAL, the court found: "Child is too young to express her wishes. GAL recommends permanent custody" to CCDCFS. The most recent GAL report, which was filed with the court on September 13, 2023, recommends granting CCDCFS's permanent custody motion as being in O.G.'s best interest. Specifically, the report states that, although Mother has been visiting with O.G. and O.G. "seems well bonded with [M]other," Mother has been appointed a "guardian due to [her] developmental delays, Mother has not competed nor made substantial progress on case plan services (as of the date of the report), in-home visits have not been approved, and reunification will not be able to occur within two years."

{¶ 54} Under subsection (c), which concerns the custodial history of the child, including, as applicable to the case at hand, whether the child has been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month

period, the court found: "The child has been in CCDCFS custody since January 2023, when the child was two months old."

{¶ 55} Under subsection (d), which concerns the child's need for a legally secure placement, the court found: "The child deserves a safe and stable home environment where all her needs can be met and she can thrive. Mother is inconsistent in addressing her case plan services and her own needs. * * * No other relatives have been identified as willing or appropriate to take legal custody. Child is placed with a kinship caregiver where she is doing well, thriving, and all of her needs are being met."

{¶ 56} Our review of the record shows that clear and convincing evidence supports the trial court's findings under R.C. 2151.414(D)(1)(a) through (d). Three witnesses — Sinkfield from CCDCFS, White from Transcend, and Bailey from Transcend — consistently testified that O.G. has a bond with both Mother and the foster family. The court's finding that the GAL recommended permanent custody of O.G. go to CCDCFS is consistent with the GAL's report recommending that permanent custody to CCDCFS is in O.G.'s best interest. As stated previously, the court's finding regarding O.G.'s custodial history is supported by clear and convincing evidence in the record. And finally, the weight of the evidence in the record lines up with the court's finding that "Mother is inconsistent in addressing her case plan services and her own needs." Sinkfield testified that Mother's participation in case programs had been inconsistent. White testified that Mother's participation at Transcend was inconsistent from May to July 2023, but that her

engagement improved starting in August 2023. Bailey testified that Mother has been consistently engaged in services since Bailey started working with Mother in August 2023. We further note that the court found "concerns" with White and Bailey's credibility. *See State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 62 ("The trier of fact is in the best position to make credibility determinations because this court cannot view the demeanor of a witness while testifying.").

### D. R.C. 2151.414(E) Factors

{¶ 57} In the case at hand, the court stated in its November 8, 2023, journal entry as follows regarding R.C. 2151.414(E):

> While the [c]ourt does not need to consider any of the factors in [R.C.] 2151.414(E) because the [c]ourt found that [R.C.] 2151.414(B)(1)(d) applies and that permanent custody is in the best intertest of the child under [R.C.] 2151.414(D)(1), * * * the [c]ourt finds by clear and convincing evidence that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, pursuant to [R.C.] 2151.414(E) * * *.
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> (2) The chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent (Mother) that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year.
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

\* \* \*

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 58} Similar to the trial court, we also conclude that there was no "need" to consider the R.C. 2151.414(E) factors in the instant case. However, the trial court analyzed some of these factors in its journal entry, hence, we review them as well.

{¶ 59} The court found that O.G. "cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, pursuant to [R.C.] 2151.414(E)" for four reasons. First, that Mother "has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home," despite "reasonable case planning and diligent efforts by" CCDCFS. Second, that Mother's mental illness and developmental disability renders her "unable to provide an adequate permanent home" for O.G. within one year. Third, that Mother "demonstrated a lack of commitment toward" O.G. by failing to consistently "support, visit, or communicate" with O.G. And fourth, that Mother "is unwilling to provide food, clothing, shelter, and other basic necessities for [O.G.] or to prevent [O.G.] from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect."

{¶ 60} Upon review, we find that the trial court's analysis of the pertinent R.C. 2151.414(E) factors is supported by clear and convincing evidence in the record. Although Mother began to consistently engage in services starting in August 2023,

and running through the time of the hearing in November 2023, the majority of the evidence in the record supports a finding that Mother was inconsistent and unsuccessful in meeting her case-plan objectives. The evidence showed that Mother had a history of inconsistency with services in this case. There was evidence in the record that Mother began to have success during the last three months prior to the hearing, but all this evidence came from Transcend. Sinkfield testified that CCDCFS did not refer Mother to Transcend, and she could not testify regarding the "details" of Mother's interactions with Transcend. Sinkfield did provide detailed testimony regarding Mother's attempts to meet her case-plan objectives through means other than Transcend's services. *See In re J.B.,* 8th Dist. Cuyahoga No. 109039, 2020-Ohio-3675, ¶ 21 ("When considering whether the agency made reasonable efforts to prevent the continued removal, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness under the statute.").

### E. Miscellaneous Findings

{¶ 61} The court further found that, as related "to Mother's [m]ental [h]ealth, the [c]ourt has concerns about Mother's current treatment at Transcend based on the Assessment * * * and the credibility of the two witnesses that testified from Transcend." Additionally, the court found that Mother has

> not made substantial additional progress on the case plan, as required by [R.C.] 2151.415(D)(2) and therefore a second extension of temporary custody cannot be ordered and would not be in the best interest of the child. Furthermore, there is not reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension.

The [c]ourt does find by clear and convincing evidence that it is in the best interest of the child to be placed in the [p]ermanent [c]ustody of CCDCFS.

## F. Conclusion

{¶ 62} Upon review, we find that clear and convincing evidence in the record supports the trial court's findings under R.C. 2151.414(B), (D), and (E). Accordingly, we find the court did not err, as shown by clear and convincing evidence in the record, when it terminated Mother's parental rights and granted custody of O.G. to CCDCFS. Mother's sole assignment of error is overruled.

{¶ 63} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

LISA B. FORBES, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
ANITA LASTER MAYS, J., CONCUR